# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alvin Sewell,                                    :
                          Petitioner             :
                                                 :
                                                 :
                    v.                           :   No. 1086 C.D. 2022
                                                 :   No. 1087 C.D. 2022
United Parcel Service (Workers'                  :   SUBMITTED:  November 7, 2024
Compensation Appeal Board),                      :
                          Respondent             :


United Parcel Service and Liberty                :
Mutual Insurance Company,                        :
                          Petitioners            :
                                                 :
                    v.                           :   No. 1143 C.D. 2022
                                                 :   No. 1144 C.D. 2022
Alvin Sewell (Workers' Compensation              :
Appeal Board),                                   :
                          Respondent             :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                      **FILED:  July 10, 2025**


        Before the Court are the cross-petitions of Alvin Sewell (Claimant) and

United Parcel Service and its insurance carrier Liberty Mutual Insurance Company

(together, Employer)[1] from an order of the Workers' Compensation Appeal Board,

affirming the decision of the Workers' Compensation Judge (WCJ).  The WCJ

---

[1] These matters were consolidated by the Court.  For briefing purposes, Claimant was designated as petitioner and Employer was designated as respondent.

granted Claimant's claim petition for a March 22, 2012 work injury for a closed period, followed by a termination. After review, we affirm in part and remand to the Board to remand to the WCJ solely to correct the record.

## I. Factual and Procedural Background[2]

Claimant submitted a claim petition on March 5, 2015, alleging he was injured while working for Employer on March 22, 2012. The claim petition provides the description of injury as "aggravation/acceleration of right foot condition," and indicates that the injury occurred from "repetitive trauma." Certified Record (C.R.), Item No. 2 at 2. Claimant sought total disability benefits as of January 14, 2014, and ongoing. He subsequently amended his claim to also include a request for total disability benefits for the period May 6, 2012 to September 29, 2013. Employer filed an answer denying all material allegations, including that Claimant provided timely and adequate notice under the Workers' Compensation Act (Act).[3] Claimant submitted a second claim petition in October 2016, alleging he sustained a further work injury on January 16, 2014. Claimant sought total disability benefits as of that date and ongoing, and Employer again denied all material allegations.

Claimant testified before the WCJ that he suffered an injury at the age of six when a car ran over and crushed his right foot. He had a skin graft performed on his foot and had "a normal amount of discomfort from that time on." C.R., Item No. 8 at Finding of Fact (F.F.) No. 5(l). Notwithstanding this injury, Claimant had "a very active life," including competing in track and cross country during his schooling. F.F. No. 5(o).

---

[2] Unless otherwise stated, the facts are taken from the WCJ's decision issued April 30, 2019. *See* Certified Record (C.R.), Item No. 8.

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

2

When Claimant was hired by Employer in 1997, he did not undergo any type of pre-employment physical examination. He worked full-time for Employer for 17 years with his last day of actual work being January 16, 2014. He initially worked as an air walker, then moved to the position of pre-loader in 2007. Claimant described the pre-loader position as "very physical," requiring significant walking and getting in and out of trucks, and "constant pivoting, squatting, as well as lifting packages over your head." F.F. No. 5(e).[4]

Claimant suffered a work-related fracture to his right foot in 2000 and was off work for three months. He fractured that same foot again in 2003 outside of the work setting, and was again off work for approximately three months. Claimant was given orthotics for both shoes at that time and reported that he performed the pre-loader position from 2007 to 2012 without incident.

Claimant began having significant issues with his right foot in early 2012. He was seen by his general practitioner, Dr. Levi Walker, and was referred to Dr. Arnold S. Broudy and Dr. Diane Johnson in March 2012. At that time, Claimant did not inform anyone with Employer that his right foot problems were work-related, but instead applied for and received short-term disability benefits.[5] Dr. Broudy then took Claimant off work from May 6, 2012 through September 29, 2013. F.F. No. 5(k); *see also* C.R., Item No. 51, Ex. C-11 at 6.

---

[4] Claimant also presented Employer's form titled "Physical Demand Assessment" for the position of pre-loader, which categorizes the essential job functions as very heavy. *See* C.R., Item No. 46, Ex. C-04.

[5] Claimant received short-term disability benefits from Employer for six months, followed by long-term disability up until May 2016. F.F. No. 15. Claimant also submitted into evidence a letter of the Social Security Administration dated April 14, 2018, informing him "that the Decision of Social Security was fully in his favor, effective January 1, 2014." F.F. No. 16.

At some point, Claimant requested to work at a less physically demanding position, specifically one that required less walking and stair climbing, but Employer denied his request. Claimant spoke to his pre-load supervisor, Cit DuBreucq, but was told he needed to speak to Employer's nurse and that Mr. DuBreucq did not have authority to give Claimant a reassignment. The following exchange between Claimant and his former counsel is informative:

> Q. Is that the --- and when did you provide notice to [Employer] of the problems you were having with your foot that you felt were due to your work activities?
>
> A. Well, I gave them a written notice in May [2012], when I gave them official written notice.
>
> Q. Okay. Who would you have given that official notice to --- or the written notice, I should say?
>
> A. That was the occupational supervisor. Because initially, I spoke with [Mr.] DuBreucq, who is the pre-load supervisor.
>
> . . . .
>
> A. Yeah. He [Mr. DuBreucq] said he didn't have the authority to give me a reassignment, that I needed to speak to the nurse, [Employer]'s nurse. And this is when the whole process began with the job reassignment.
>
> Q. So you see Dr. Broudy in March of 2012, and it's after that that you notified [Employer] that Dr. Broudy told you ---
>
> A. Yes.
>
> Q. --- for a reassignment or different job duties?
>
> A. Yes.

4

C.R., Item No. 29, Apr. 28, 2015 Hr'g Transcript at 21-22. Claimant provided Employer with a three-page form dated May 23, 2012, which contains detailed information from Dr. Johnson regarding her evaluation and treatment of Claimant, and how his diagnosis "precludes or impairs [his] ability to perform" multiple job functions. C.R., Item No. 51, Ex. C-11 at 35-38. Claimant was never assigned modified work at any time by Employer.

Claimant returned to work on September 30, 2013,[6] but stopped working again on January 16, 2014, "because he was experiencing recurrent breakdown of the soft tissue of the right foot at the instep where [his skin] graft was." F.F. No. 5(h). Claimant attributed this tissue breakdown to the constant walking and stair climbing involved in his job.

On April 22, 2014, Dr. Heckler performed surgery on Claimant's right foot to remove an osteophyte, i.e. bone spur. Claimant had issues with the skin graft after the surgery and the incision became infected, which delayed healing. When Claimant testified in April 2015, he was wearing a surgical shoe and had not been able to wear a regular shoe since the April 2014 surgery. When Claimant testified in May 2018, he was wearing shoes with extra depth and/or orthotics and continuing to see Drs. Walker, Johnson, and Burns for his right foot. He testified that he continues to experience swelling, pain, inflammation, and stiffness in his right foot,

---

[6] In October 2013, Claimant also suffered a fall at home that affected the skin on the top of his right foot. He went back to work, but his foot got worse. As the WCJ found,

> [h]e did tell Mr. DuBreucq, as well as [Clayton] Delaney and Michelle Hess[,] that he was suffering from a possible aggravation of a non work[-]related condition at that time. He told each of them that he had a right foot injury and he needed accommodation because he was having problems doing the essential job functions.

F.F. No. 5(x).

that his condition has gotten worse since January 2014, and that he does not believe he could perform his pre-loader job.

Claimant submitted the deposition testimony of Dr. Johnson, who is board certified in podiatric medicine and surgery. Dr. Johnson began treating Claimant in March 2012 for a painful right foot. Claimant informed Dr. Johnson at that time that he loaded and unloaded trucks for Employer and that these activities were causing issues with his foot. Dr. Johnson observed a skin graft at the top of Claimant's foot with a protruding area caused by an osteophyte, resulting in problems and irritation from shoe rubbing. She recommended a shoe modification and possible surgery to shave the area down, which Dr. Heckler performed in April 2014. Following surgery, Claimant developed an ulcer on his foot which took almost a year to completely heal.

Dr. Johnson diagnosed Claimant with "post traumatic arthritis of the right foot, status post history trauma as a child, skin graft to the dorsal aspect of the right foot and fractures to the right and mid[-]foot with post traumatic arthritis and skin grafting." F.F. No. 9 at p. 11. She opined, within a reasonable degree of medical certainty, that Claimant's job duties as a pre-loader were a contributing factor to the issues he was suffering in his right foot. As she explained,

> [i]f you're looking at his foot, . . . [t]he skin is the top layer. Then you go through, you have your blood vessels, your arteries, nerves and tendons. So with the injury to the top of the foot, he injured every one of those layers, even down to the point of the bone. There's also muscle on top of the foot in that area too. So if you've injured muscular structures, vascular structures, bony structures, it will without a doubt have an effect on the function of the foot. If he's climbing stairs, descending stairs, heavy lifting, jumping off of . . . the way he described it to me as a pre-loader, he was jumping off of the trucks so, of course, it's

6

going to have an effect on a foot that has been compromised.

F.F. No. 9 at 12. In paperwork Dr. Johnson completed for Employer in August 2016, she indicated that Claimant was not able to perform the normal functions of his job, e.g. excessive standing, walking, stair-climbing, and related functions, without aggravating his chronic right foot issues and risking further graft breakdown. She further recommended that "[C]laimant perform sedentary positions to decrease the likelihood of recurrent right foot complications." F.F. No. 9 at 13. Dr. Johnson testified that just a few hours of performing the duties of pre-loader could "absolutely" aggravate Claimant's condition. F.F. No. 9 at 14.

Dr. Johnson did acknowledge that the osteophyte she observed on Claimant's right foot in 2012 "was not due to work but was the direct result of a degenerative arthritic condition which evolved from [C]laimant's earlier injuries to that foot." F.F. No. 9 at 13. She further admitted that the forms she submitted to Employer in May 2012 were prepared pursuant to the Americans with Disabilities Act (ADA)[7] and in completing those forms "she did not relate [C]laimant having a work[-]related injury, just having difficulty performing the job duties because of his right foot." *Id.*

Claimant also presented the deposition testimony of Dr. Walker, his general practitioner. While Dr. Walker started seeing Claimant at the end of 2011, he began more actively treating Claimant for his right foot upon Dr. Broudy's retirement in 2015. Dr. Walker received records for Claimant from Dr. Broudy for the period of March 2012 through March 2015; however, he did not receive records from Dr. Johnson or Dr. Heckler.

_____

[7] 42 U.S.C. §§ 12101-12213.

After reviewing records and evaluating Claimant in December 2015, Dr. Walker noted the skin graft area "was very thin and you could literally see the bone protrusion coming through that thin skin." F.F. No. 10 at 15. Dr. Walker diagnosed Claimant at that time with arthropathy of the right foot and opined that the diagnosis was work-related. He explained that although Claimant had pre-existing foot arthropathy from age six, Claimant had been able to work for Employer for some years, and "it was the intensity of the activity with that foot at work that brought out the pain" in 2012. *Id.* In addition, when Claimant returned to work after some time being off, he developed ulcerations on his foot. Dr. Walker recommended that Claimant continue to treat with Dr. Johnson and transition to another position at work. Dr. Walker noted that the restrictions he placed on Claimant had already been implemented as Claimant was not working at that time and was going through physical therapy.

Claimant was seen by Dr. Walker again in January 2016. He continued to complain of right foot pain and Dr. Walker's diagnosis remained the same. Claimant returned to see Dr. Walker again in March and June 2016. Dr. Walker testified that Claimant remained incapable of performing the job of pre-loader.

Dr. Walker was not aware that Claimant's non-work-related October 2013 injury disrupted the skin graft on his right foot. He acknowledged that the bills for services he performed for Claimant were not submitted to Employer or its insurance carrier at any time. Dr. Walker agreed that the arthritis and bone spurs in Claimant's right foot were a direct result of his childhood trauma. According to Dr. Walker, Claimant was "extremely straight forward" and "had made a sincere attempt to try to get better in regard[] to his right foot and was not a symptom magnifier or an exaggerator of his complaints." F.F. No. 10 at 16.

8

Finally, Claimant offered the opinion of Dr. Broudy, a board certified orthopedic surgeon who first saw Claimant for his right foot in March 2012. Dr. Broudy expressed the opinion, which corroborates that of Dr. Walker, that "[C]laimant was totally disabled from performing the job of pre-loader" for Employer and that he "will continue to have difficulty with the skin graft if he has to do any type of significant physical labor or excessive walking." F.F. No. 11. Employer objected to Dr. Broudy's report as hearsay and the WCJ only considered it "to the extent it corroborate[d] Dr. Walker's testimony." *Id.*

For its part, Employer presented the testimony of Mr. DuBreucq, a pre-load supervisor with Employer for 12 years. Mr. DuBreucq testified that he "did not have a conversation in March[] 2012 that [C]laimant had sustained a work[-]related injury to his right foot," and he never received any medical documentation to this effect. F.F. No. 6(c). Mr. DuBreucq noted that if a work-related injury is reported, "[i]t's a huge process," with numerous forms to fill out and people to contact. F.F. No. 6(d). While that process did occur when Claimant injured his elbow at work in 2012, it never occurred with respect to his right foot. Employer did have an alternative work program where an injured employee would, for a limited time, be provided work within their physician's restrictions, but again this did not occur for Claimant's right foot injury. Mr. DuBreucq did not take part in Employer's ADA accommodation process and did not have any conversations regarding accommodations for Claimant's right foot.

Clayton Delaney testified that he was an on-road supervisor for Employer. Prior to taking that position, he was a pre-load supervisor from 2011 to the end of 2014 and was Claimant's direct supervisor. At no time before or after February 23, 2012, did Claimant report to Mr. Delaney that he sustained an injury

9

to his right foot as a result of his work duties. Claimant also never presented Mr. Delaney with any job restrictions, asked him for an accommodation, or requested to see a panel physician. However, Mr. Delaney conceded that "[C]laimant may have related the difficulty he was having with the pre-existing problems with his right foot was being worsened by work activity." F.F. No. 7(d).

Employer's medical expert, Dr. Jeffrey Kann, conducted an initial independent medical examination (IME) of Claimant in August 2015, which included reviewing various medical records and reports, taking a history from Claimant, and taking x-rays. At that time, "Dr. Kann noted the presence of a well matured, split thickness skin graft on the dorsum part of [Claimant's] foot, with no open areas." F.F. No. 12 at 17. Further, there was "pretty significant arthritis," which was a normal expectation given Claimant's childhood injury, and the bone spur Claimant previously had was gone. F.F. No. 12 at 17-18. Dr. Kann opined that this bone spur was not work-related or aggravated by his work as a pre-loader. Further,

> [i]t was Dr. Kann's opinion that [C]laimant's work activities did not in any way cause or aggravate [his] well-recognized pre-existing right foot problems, both with respect to his arthritis, as well as the skin graft. The dorsal ulceration was a result of the underlying bone spur which is why Dr. Heckler removed the spur.

F.F. No. 12 at 18.

Dr. Kann conducted a second IME of Claimant in February 2017, which included a review of additional medical records and reports, and he authored a narrative report dated February 13, 2017. Upon conducting a physical examination, Dr. Kann observed that Claimant's arthritis, a progressive condition, was slightly worse than when he previously saw Claimant. However, Claimant's skin graft was

10

well-healed with no openings or ulcerations, and Dr. Kann described Claimant's right ankle motion as quite good. While Claimant may have some discomfort from the arthritis, for which he may have to take anti-inflammatory medication, "he's certainly functional and employable." F.F. No. 12 at 19. Dr. Kann did not disagree with the early treatment recommendations of Drs. Broudy and Johnson concerning orthotics and light duty work, and he recognized that it took approximately eight months for the wound on Claimant's foot to heal after Dr. Heckler removed the bone spur. However, Dr. Kann reiterated his opinion that Claimant's employment was not in any way a causative factor in his arthritis or skin graft breakdown and that he could return to work as a pre-loader without restriction.

In April 2019, the WCJ issued a decision and order granting the claim petition for the periods from May 6, 2012 through September 29, 2013, and from January 16, 2014 through February 13, 2017. Employer was to be given credit for any short- and long-term disability benefits paid to Claimant during these periods. The WCJ also dismissed as moot Claimant's October 2016 claim petition, ordered Employer to pay Claimant's counsel reasonable costs of litigation, and granted Employer's termination petition effective February 13, 2017.

Based on the credited testimony of Claimant and the opinions of Drs. Johnson and Walker, the WCJ found that on March 22, 2012, Claimant sustained a work-related aggravation of the pre-existing condition of his right foot–namely his "underlying osteophytic arthritic condition" and his skin graft–that totally disabled him during the above closed periods. F.F. No. 17. The WCJ specifically rejected Dr. Kann's opinion that Claimant did not have a work-related disability during these periods. The WCJ further found that Claimant gave Employer proper notice of his

11

work injury through conversations with Employer and the answers Dr. Johnson provided on Employer's form dated May 23, 2012, stating

> it would be hard to believe that the several conversations that [C]laimant had with [E]mployer during this time period about accommodating [C]laimant's work duties in light of his right foot condition did not include any statement by [C]laimant that the work duties were causing increased pain and discomfort to his right foot as a result of aggravating his underlying foot condition. This is, in fact, why [C]laimant was asking for the accommodations.

F.F. No. 18.

Regarding the termination petition, the WCJ found "that as of February 13, 2017, the aggravation to [C]laimant's right foot that had been caused by the work activities had ceased and that [C]laimant's disability was . . . solely due to the underlying conditions of arthritis, formation of osteophytes[,] and the thin graft." F.F. No. 19 at 22. In other words, "[C]laimant was at baseline." F.F. No. 19 at 23. The WCJ credited the testimony of Dr. Kann on this issue, noting that Claimant had been out of work for three years by the time of the second IME and Dr. Kann observed a well healed graft with no openings or ulcerations. Further, neither Dr. Walker nor Dr. Johnson expressed an opinion that Claimant's bone spurs or arthritis in his right foot were due to anything but his childhood trauma. Notably, while the WCJ extensively discussed the testimony of Dr. Kann and relied upon that testimony in granting the termination petition, the list of exhibits in the WCJ's decision indicates that Dr. Kann's deposition transcript was not admitted into evidence. *See* C.R., Item No. 8 at 2.

Both Claimant and Employer appealed to the Board, each raising multiple issues, including that Claimant's litigation costs had not been paid. In a

12

decision issued in December 2020, the Board remanded "solely for the purpose of allowing the WCJ to consider all evidence of costs, as it exists in the record as it currently stands." C.R., Item No. 17 at 25. The Board affirmed the WCJ's decision in all other respects.[8]

Following remand, the WCJ[9] issued a decision and order clarifying that the parties agreed that all litigation costs had since been paid. Claimant subsequently appealed and the Board affirmed, and the cross-petitions to this Court followed.

## II. Issues

Claimant argues that the WCJ erred by relying on the deposition testimony of Employer's medical expert, Dr. Kann, because the transcript was not admitted into evidence. Absent Dr. Kann's testimony, Claimant maintains there is not substantial evidence in the record to support Employer's termination petition. In its cross-petition, Employer contends that the WCJ erred in finding that Claimant met his burden of demonstrating proper notice was given.

## III. Discussion

### A. Notice

We begin with Employer's argument regarding notice as, under the Act, "notice is a prerequisite to receiving workers' compensation benefits[.]" *Gentex Corp. v. Workers' Comp. Appeal Bd. (Morack)*, 23 A.3d 528, 534 (Pa. 2011). In a claim proceeding, the claimant bears the burden of establishing all necessary

---

[8] The Board also considered at that time Employer's motion to dismiss, which was based upon Claimant's failure to file a timely brief despite requesting and receiving multiple extensions of time. While the Board denied the motion, it explained that "Claimant's appeal w[ould] be decided only on the basis of his timely filed [a]ppeal documents." C.R., Item No. 17 at 3.

[9] We note that WCJ Lowman issued the initial decision dated April 30, 2019. Following remand, WCJ Lowman left the bench, and the matter was reassigned to WCJ Abes. C.R., Item No. 23 at F.F. No. 6.

elements to support an award, including notice. *Id.*; *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Pursuant to Section 311 of the Act, a claimant shall give notice to employer of a work-related injury within 120 days after the injury, or from the date the claimant learns the injury is work-related. 77 P.S. § 631. Section 312 of the Act provides that the notice must inform the employer that the claimant received an injury "in the course of his employment on or about a specified time, at or near a place specified." 77 P.S. § 632.

The Act does not speak to whether notice is adequate; rather, "the parameters of what constitutes adequate notice in a given case has been developed through our caselaw." *Gentex*, 23 A.3d at 534. Because the issue of notice is significantly fact driven, we must take "into consideration the totality of the circumstances" and "great deference is to be given to the lower tribunal's determinations." *Id.* at 537, 534. Notice "may be provided over a period of time or a series of communications," and we cannot ignore the context of the communications between the claimant and his employer. *Id.* at 537.

Here, Employer does not challenge any of the WCJ's specific findings of fact. Rather, Employer contends that Claimant knew of the alleged causal connection between his right foot issues and his work duties as early as March 2012, but did not provide notice to Employer until his initial claim petition was filed in March 2015, well beyond the 120-day statutory notice period.

Employer's argument lacks merit as the WCJ credited Claimant's testimony on this issue and found that he had multiple communications with Employer regarding how his work duties were aggravating his pre-existing right foot condition. Specifically, the WCJ found that Claimant spoke to his supervisor, Mr. DuBreucq, about his right foot in May 2012; that Mr. DuBreucq told Claimant he

14

needed to speak to one of Employer's nurses and that Mr. DuBreucq did not have the authority to give Claimant a reassignment; that shortly thereafter, Claimant provided written notice to Employer via the form filled out by Dr. Johnson; that Claimant requested a reassignment to a different position that would not require as much walking and stair-climbing; and that Dr. Broudy provided Employer with written notice taking Claimant off work from May 6, 2012 through September 29, 2013. F.F. No. 5(k), (m), (n). Most notably, the form Dr. Johnson supplied to Employer dated May 23, 2012, indicates that Claimant could not perform all of the functions of his pre-loader position—e.g., excessive standing, walking, and ladder and stair climbing—without aggravating his right foot pain and discomfort. F.F. No. 9 at 13-14. Employer also should have been on notice of the issue given Claimant's request for accommodation through the ADA and his receipt of both short- and long-term disability benefits. Given the totality of this credited evidence, the Board did not err in finding that there is substantial evidence to support the WCJ's determination that Employer received adequate and timely notice. *See Gentex*.

### B. Dr. Kann's Testimony and the Termination Petition

Claimant maintains that the WCJ erred by relying on the deposition testimony of Employer's medical expert, Dr. Kann, because the list of exhibits in the WCJ's decision indicates that Dr. Kann's deposition transcript was not admitted into evidence. Moreover, the deposition transcript is not part of the certified record transmitted to this Court on appeal and Employer failed to request that the record be supplemented. Claimant maintains that absent Dr. Kann's testimony, the record lacks substantial evidence to support the finding that his remaining disability is no longer the result of his work injury. Thus, the Board erred in affirming the WCJ's

15

decision to grant Employer's termination petition. Claimant's argument, however, misses the mark.

Initially, we recognize the well-established principle "that items which are not part of the record may not be considered by the fact-finding tribunal, or the appellate body on review." *Kimberly Clark Corp. v. Workers' Comp. Appeal Bd. (Bullard)*, 790 A.2d 1072, 1075-76 (Pa. Cmwlth. 2001). Because the only evidence Employer presented with respect to its termination petition was the deposition testimony of Dr. Kann, the admission status of that testimony is critical. *See Westmoreland Cnty. v. Workers' Comp. Appeal Bd. (Fuller)*, 942 A.2d 213, 217 (Pa. Cmwlth. 2008) ("On a termination petition, an employer bears the burden of proving by substantial evidence that a claimant's disability ceased, or any remaining conditions are unrelated to the work injury.")

Section 413 of the Act provides as follows:

> A [WCJ] may, at any time, review and modify or set aside a notice of compensation payable and an original or supplemental agreement or upon petition filed by either party with the department, or in the course of the proceedings under any petition pending before such workers' compensation judge, if it be proved that such notice of compensation payable or agreement *was in any material respect incorrect*.

77 P.S. § 771 (emphasis added). This Court has interpreted Section 413 as also allowing for corrections to WCJ decisions, which can be accomplished by either a party's petition or *sua sponte* by the WCJ or the Board. As we explained in *Johnson v. Workers' Compensation Appeal Board (Budd Company)*, 693 A.2d 1015, 1017 (Pa. Cmwlth. 1997), "an administrative agency may, on its own motion, correct typographical, clerical and mechanical errors, as well as undisputed factual errors

16

and factual misconceptions, provided proper notice and explanation is given." *See also Bentley v. Workers' Comp. Appeal Bd. (Pittsburgh Bd. of Educ.)*, 987 A.2d 1223, 1230 (Pa. Cmwlth. 2009) (the Board may make a technical correction "to conform to the evidence presented by [the e]mployer"). However, Section 413 does not apply where correction of the alleged error requires additional findings of fact or conclusions of law, or a change in the WCJ's factual or legal analysis. *Varkey v. Workers' Comp. Appeal Bd. (Cardone Indus. & Fireman Fund)*, 827 A.2d 1267, 1273 (Pa. Cmwlth. 2003); *Butcher v. Workmen's Comp. Appeal Bd. (Treadway Resort Inn)*, 517 A.2d 1023, 1026 (Pa. Cmwlth. 1986).

Our review of this matter reveals that the WCJ's failure to list Dr. Kann's deposition transcript as an admitted document is merely an administrative oversight. The last evidentiary hearing before the WCJ—outside of what occurred on remand, which was limited to the issue of litigation costs and therefore not relevant to the disposition of the termination petition—occurred on May 30, 2018. *See* C.R., Item No. 39, May 30, 2018 Hr'g Transcript. During that hearing, the parties discussed that the only remaining deposition was that of Dr. Kann, which was scheduled for the very next day. *Id.* at 6. The WCJ left the record open following the hearing and issued an order dated June 5, 2018, stating, in pertinent part: "Employer is to submit Dr. Kann's deposition transcript on or before June 29, 2018." C.R., Item No. 6 at 3. In compliance with that order, Employer uploaded Dr. Kann's deposition transcript to the Workers' Compensation Automation and Integration System (WCAIS) on June 21, 2018. *See* C.R., Item No. 17 at 15 n.11. Claimant did not object to the admission of the deposition at any point, and since no further hearings were held, there was not an opportunity for Employer to formally move the transcript into evidence. More importantly, the WCJ discussed Dr. Kann's

17

testimony extensively in his decision, and clearly relied upon it in granting Employer's termination petition. *See* F.F. No. 12 at 17-20 (summarizing Dr. Kann's testimony); F.F. No. 19 at 22-23 (finding Employer met its burden regarding the termination petition based on Dr. Kann's testimony).

The Board recognized this reliance and, therefore, rejected Claimant's assertion that Dr. Kann's testimony was not properly part of the record. Rather than remanding the case to the WCJ to fix the issue, which was within the Board's power to do and warranted under the circumstances, the Board simply considered the deposition testimony as admitted evidence. *See* C.R., Item No. 17 at 15 n.11. This was error, and this Court now cannot conduct proper appellate review of the decision to grant Employer's termination petition without access to Dr. Kann's testimony. Therefore, we are unfortunately constrained to remand this case to the Board for a remand to the WCJ to correct the omission. *Johnson*, 693 A.2d at 1018.

## IV. Conclusion

In sum, we affirm, in part, the Board's order with respect to the notice issue, and this case is remanded to the Board for remand to the WCJ solely to correct the record as to Dr. Kann's deposition transcript. The corrected record shall be remitted to this Court within 30 days of our Order.

_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita

18

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alvin Sewell,                                     :
                          Petitioner              :
                                                  :
          v.                                      :    No. 1086 C.D. 2022
                                                  :    No. 1087 C.D. 2022
United Parcel Service (Workers'                   :
Compensation Appeal Board),                       :
                          Respondent              :

United Parcel Service and Liberty                 :
Mutual Insurance Company,                         :
                          Petitioners             :
                                                  :
          v.                                      :    No. 1143 C.D. 2022
                                                  :    No. 1144 C.D. 2022
Alvin Sewell (Workers' Compensation               :
Appeal Board),                                    :
                          Respondent              :

# **O R D E R**

AND NOW, this 10th day of July, 2025, the order of the Workers' Compensation Appeal Board (Board) is AFFIRMED, in part, in accordance with the accompanying opinion. The matter is REMANDED to the Board for REMAND to the Workers' Compensation Judge solely to correct the record. The corrected record shall be remitted to this Court within 30 days of this Order.

Jurisdiction retained.

_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita